**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
DOROTHY D'AMATO,

                    Plaintiff,                **MEMORANDUM OF**
                                              **DECISION & ORDER**
          -against-                           12-cv-3395 (ADS) (AKT)

FIVE STAR REPORTING, INC. and
MICHAEL RAFKIND,

                    Defendants.
------------------------------------------------------------X

<u>**APPEARANCES:**</u>

**Zabell & Associates, P.C.**
*Attorney for the Plaintiff*
1 Corporate Drive, Suite 103
Bohemia, NY 11716
          By: Saul D. Zabell, Esq., Of Counsel

**Kaufman, Dolowich, Voluck & Gonzo, LLP**
*Attorneys for the Defendant*
135 Crossways Park Drive
Suite 201
Woodbury, NY 11797
          By: Leslie M DiBenedetto, Esq.
               Scott A. Goodman, Esq.
               Jeffery A. Meyer, Esq., Of Counsel

**SPATT, District Judge**.

          On August 31, 2010, Reporter's Ink Corp. ("Reporter's Ink") entered into an agreement

with the Plaintiff Dorothy D'Amato ("D'Amato") to acquire her shares of the Defendant Five

Star Reporting, Inc. ("Five Star") in exchange for structured payments of $500,000. As part of

the agreement, the Plaintiff was hired by Five Star as a manager of sales and customer retention.

          On July 10, 2012, the Plaintiff commenced this action against the Defendants Five Star

and Michael Rafkind, the President of Five Star, (collectively, the "Defendants") seeking

declaratory relief and monetary damages for overtime compensation and commissions allegedly

1

owed to her by the Defendants. She asserted common law causes of actions for breach of contract and in the alternative, quantum meruit and unjust enrichment. In addition, she asserted that the Defendants violated various provisions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq*. and New York Labor Law ("NYLL"), N.Y. Lab. Law § 190 *et seq.*

On September 21, 2012, the Defendants filed counterclaims against the Plaintiff. In particular, the Defendants sought $210,000 in monetary damages and asserted that the Plaintiff (i) breached the Share Purchase Agreement by failing to disclose to Reporter's Ink the pre-acquisition liabilities, tax liens, and obligations of Five Star; and (ii) in the alternative, was unjustly enriched by her failure to disclose Five Star's pre-acquisition liabilities.

On December 21, 2012, the Plaintiff amended her complaint to add claims for retaliation under the FLSA and the NYLL.

Presently before the Court are (i) the Plaintiff's motion for summary judgment pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56 on its claims against the Defendants and to dismiss the Defendants' counterclaims; and (ii) the Defendants' cross-motion pursuant to Fed. R. Civ. P. 56 for summary judgment on their counterclaims and to dismiss the Plaintiff's claims.

For the following reasons, the parties' motions are granted in part and denied in part.

## I. BACKGROUND

Unless stated otherwise, the following facts are drawn from the parties' Rule 56.1 statements. Triable issues of fact are noted.

## A. The Parties

The Defendant Five Star is a New York corporation that manages and owns court reporting operations in Suffolk County, New York.  (Am. Compl. at ¶ 13; the Defs.' Counterstatement of Facts at ¶ 3.)  Five Star has gross revenue**s** in excess of $500,000 per year.

The Defendant Michael Rafkind ("Rafkind") is a domiciliary of New Jersey (Am. Compl. at ¶ 4; the Def.'s Answer at ¶ 4.)  Prior to the acquisition of Five Star by Reporter's Ink on August 31, 2010, Rafkind was a principal of Reporter's Ink. (Rafkind Decl. at ¶ 18.)  Following the acquisition, Rafkind became the President of Five Star.  (Id. at ¶ 1.)

The Plaintiff is a resident of Suffolk County.  From August 31, 2010 to March 12, 2012, she was employed by Five Star as a "manager of sales and customer retention." (D'Amato Decl. at ¶¶ 4, 33.)

## B. Pre-Acquisition Debts and Obligations of Five Star

Prior to Reporter's Ink acquiring Five Star on August 31, 2010, Five Star had defaulted on certain obligations and incurred tax assessments.  In particular, on October 3, 2007, Five Star entered into an equipment lease with De Lage Landen Financial Services, Inc. ("De Lage") to lease equipment for a period of sixty-three months for $1,915.06 per month.  (Meyer Decl., Ex. F.)  Five Star made a total of $6,300 of the $76,602.40 in payments owed to De Lage before defaulting on the lease agreement.  (Id.)

In addition, Five Star had a lien for unpaid taxes that was later assessed by the Internal Revenue Service ("IRS") on September 1, 2010 to be $28,268.66.  (Meyer Decl., Ex. G; Rafkind Decl. at ¶ 24.)

Lastly, prior to August 31, 2010, Five Star had outstanding invoices for services rendered by the following vendors: "State Insurance Fund, Safe Guard, Pitney Bowes, Broadview Networks, Village Office Supply, Votto & Cassata, Steinberg & Boyle, Lisseth Cutti, U.S. Legal

3

Support and Wells Fargo."  (Rafkind Decl. at ¶ 24; Meyer Decl., Ex. E.)  The Defendants do not

provide the invoices from these vendors, nor do they make clear how much money Five Star

owed to each of the vendors.

## C. Negotiations Prior to the Share Purchase Agreement

Prior to entering the Share Purchase Agreement, the Plaintiff, together with Lisa Lugo

("Lugo") and Adrienne Militello ("Militello") (collectively, the "Sellers"), were the sole

shareholders of Five Star.  As stated above, Rafkind was then a principal of Reporter's Ink and

was involved in negotiating the Share Purchase Agreement with the Sellers.  (Rafkind Decl. at ¶

19.)  The parties do not make clear when negotiations commenced.

During negotiations, Lugo, Militello, and the Plaintiff provided documents to Reporter's

Ink regarding Five Star's business.  (Zabel Decl., Ex. I.)  The parties do not make clear the

precise date when the Plaintiff provided these documents to Reporter's Ink.  However, an

undated report entitled, "Due Diligence" lists the documents that were provided to Reporter's Ink

as part of the due diligence process.  (Id. at 1.)  In particular, page 13 of the report, entitled

"Financial Information," notes in response to a request for "tax returns" "for the last five years,"

"[t]ax returns [were] supplied."  (Id. at 13.)  In addition, page 16 of the document, entitled

"Taxation," asks "each member of the Group" to specify the "latest date up to which tax returns

and computations have been settled."  In response, the document states, "3rd quarter 2010 for all

taxes."  (Id. at 16.)  For purposes of the present motion, the parties did not provide the Court with

the tax returns or other documents that were allegedly provided to the Defendants prior to the

closing.

The Plaintiff asserts that based on reviewing Five Star's tax returns, the Defendants were

aware of Five Star's tax liabilities and other obligations. (The Pl.'s Statement of Facts at ¶ 27.)

4

However, the Defendants assert that these documents, including the tax returns, did not indicate Five Star's outstanding debts.  (Rafkind Decl. at ¶ 16.)

In addition, the Plaintiff, represents that Rafkind "assured" her prior to the signing the Share Purchase Agreement that "he would take responsibility for any and all remaining liabilities attributable to Five Star and to [her], as a former shareholder."  (D'Amato Decl. at ¶ 50.) Rafkind disputes making such a statement.  (Rafkind Decl. at ¶ 24.)

### D. The Share Purchase Agreement

On August 31, 2010, Reporter's Ink entered into an agreement with the Sellers to purchase one hundred fifty shares of common stock of Five Star, which shares represented one hundred percent of the total outstanding shares of stock of the corporation.  (Meyer Decl., Ex. B, at 1.)  As a result, Reporter's Ink became the sole shareholder of Five Star.  (See id.).  As described below, it appears that Reporter's Ink became the parent company of Five Star, and Five Star continued to do business as a court reporting company under its own name.  However, the parties do not make clear the precise relationship of Reporter's Ink to Five Star following the acquisition.  In addition, Reporter's Ink is not a party to this action.

In consideration for the shares, Reporters Ink agreed to pay each Seller $500,000 for a total of $1,500,000. (Id. at 1–2.) In that regard, Reporter's Ink agreed to pay each Seller $200,000 at closing and the remaining $300,000 in structured payments beginning on September 1, 2011. (Id. at 2.)

As "additional consideration," the Sellers agreed to "retain responsibility and liability for any lawsuits, claims or other obligations or liabilities of [the] [S]ellers or Five Star, incurred prior to the date of closing, of any kind and nature other than those specifically assumed under this Agreement."  (Id. at 3.)

In addition, Reporter's Ink. agreed that the Sellers "will be guaranteed court reporting work for a minimum of $20,000 per seller per calendar year for three (3) years starting January 1, 2011." (Id.)

In a section entitled, "Representations by Sellers," the Sellers represented that: (i) "[the] Sellers have disclosed all assets and liabilities of Five Star to [the] buyer"; (ii) "Five Star's payment of the taxes owed by it is current and not in arrears"; (iii) "[the] Sellers are aware of no actions against [the] [S]ellers(s) and no facts which could or may give rise to an action against [the] [S]ellers(s)"; (iv) "[the] [S]ellers are aware of no actions against the corporation and no facts which could or may give rise to an action against the corporation or Five Star other than the New York State Department of Labor investigation involving Rebecca Wood"; and (v) "[the] [S]ellers are not aware of any liens against corporate property[.]" (Id. at 4.)

In a section entitled, "Warranties by Sellers," the Sellers warranted that "Five Star will be free of any debt at the date of the sale (including shareholders loans, and/or other shareholder financing), as related to Five Star, not personally by each shareholder." Id. at 5. The Sellers further warranted that "[a]ny existing UCC filings will be removed and federal, state and local taxes will be filed and paid to date other than the disclosed IRS Payroll Tax Lien."

Finally, in a section entitled, "Indemnity for taxes—Sale of stock," the Agreement states that the Sellers "will indemnify [Reporter's Ink] for . . . any and all liabilities, including, without limitation, interest, additions to tax, fines, assessments and penalties, and reasonable attorney's fees incurred . . . with respect to" "(a) [t]axes for any taxable year ending prior to the closing date" and "(b) [t]axes of Five Star for the portion of the taxable year ending on the closing date for the taxable year of Five Star that includes the closing date." (Id. at 8.)

6

**E. The Plaintiff's Employment Agreement**

Following its acquisition, Five Star kept its name and continued to do business, and Rafkind became its President. (Rafkind Decl. at ¶ 1.)  As described above, it appears that Reporter's Ink was the parent of Five Star, though the parties do not make the relationship explicit in their papers.

On August 31, 2010, the same day that the Share Purchase Agreement was executed, the Plaintiff, in a separate Employment Agreement, agreed to "relinquish[] her right to $300,000**"** of her compensation under the Share Purchase Agreement in consideration for being hired by Five Star as "manager of sales and customer retention" for a period of 60 months commencing on August 31, 2010.  (Meyer Decl., Ex. A, at 1.)

With respect to her position, the Employment Agreement states, "Employee shall devote her entire working time and best efforts to selling [Five Star]'s services and managing the sales and customer retention practices of [Five Star] and shall conduct herself so as to reflect credit upon [Five Star]." (Id.)  In addition, the Agreement states, "Employee will have no power to hire or fire employees except with approval of her supervisor," and that "Employee . . . will observe [Five Star's] work hours, being Mon–Fri 9am to 6pm or as otherwise requested by [Five Star]." (Id.)

The Employment Agreement further states that the Plaintiff's salary "shall consist of a base annual salary of $40,000 plus commissions and bonuses as indicated in paragraph IV and V below." (Id.)  Paragraph IV of the Agreement, entitled "Commissions and Charges," provides that the Plaintiff "will earn a 10% sales commission on the new sales generated in each calendar year for the years 2011, 2012, 2013, 2014, 2015."  The Agreement defines "new sales" as "sales directly generated by Employee within any one calendar year." (Id.)

7

**F. The Nature of the Plaintiff's Employment**

The parties dispute the nature of the Plaintiff's position as a "manager of sales and customer retention."  The Plaintiff asserts that her "job duties were entirely sales based" and that she "did not supervise any other employees."  (D'Amato Decl. at ¶ 4.)  However, Rafkind represents that the she had significant authority: "Her duties included: office/non-manual work that went to the core of [the] Defendant's business, client and revenue generation.  [The] Plaintiff had discretion to provide bid proposals and quotes to potential clients."  (Rafkind Decl. at ¶ 3.)

The parties also dispute whether the Plaintiff worked in excess of forty hours per week.  In particular, the Plaintiff claims that she was required pursuant to the terms of the Employment Agreement to work from 9 am to 6 pm five days a week.  (D'Amato at ¶ 8.)  Thus, she claims to have regularly worked forty-five hours per week.  (Id.)  She further represents that she was not afforded a lunch break; "often" "began work before 9 am and continued working past 6 pm"; and worked on "Saturdays and Sundays."  (D'Amato at ¶¶ 8–11.)  As a result, the Plaintiff claims that she often worked in excess of forty hours per week but was not properly compensated for those additional hours. (Id. at ¶12.)

However, Rafkind asserts that the Plaintiff was not required to work specific hours under the Employment Agreement.  (Rafkind Decl. at ¶4.)  He further states that the Plaintiff often worked from her home and was "very rarely" present at the Defendant's offices.  (Id.)  Lastly, Rafkind asserts that the Plaintiff often took lunch breaks that exceeded one hour.  (Id. at ¶5.)  Therefore, Rafkind claims that the Plaintiff did not work in excess of forty hours per week. (Rafkind Decl. at ¶ 4.)

**G. The Plaintiff's Commissions**

In 2011 and 2012, the Plaintiff received four checks from Five Star representing commissions for sales that she had consummated during that period: (i) a $1,022.11 check, dated January 1, 2011; (ii) a $904.10 check, dated Mach 27, 2012; (iii) a $614.40 check, dated August 5, 2012; and (iv) a $2,702.43 check, dated February 1, 2012.  (Meyer Decl., Ex. D.)

However, the Plaintiff did not receive a check for her work in procuring a contract with Suffolk County for stenographic services between March 1, 2011 and February 28, 2012. (D'Amato Decl. at ¶ 19.)  Prior to 2011, Suffolk County had been Five Star's client.  (Rafkind Decl. at ¶ 39.)  On October 22, 2010, Suffolk County sent Five Star an invitation to provide a bid for court reporting services related to depositions and hearings.  (Zabell Decl., Ex. K.)  The Plaintiff signed and accepted Suffolk County's invitation on behalf of Five Star.  (Id.)  On November 18, 2010, Five Star submitted its bid to Suffolk County.  (Id.)  The forms indicate that Five Star's contacts for the project were the Plaintiff and Rakind. (Id.)  On the same day, Suffolk County accepted Five Star's bid for stenographic services.  (Id.)

The parties dispute the Plaintiff's role in this transaction.  In her declaration, the Plaintiff states that she "developed and submitted Five Star Reporting's bid proposal [to Suffolk County]" and "attended the bid proposal where Five Star Reporting was ultimately the successful bidder for the Suffolk County [c]ontract."  (D'Amato Decl. at ¶ 20.)  As such, the Plaintiff claims that she is entitled to a sales commission in the amount of $35,000 pursuant to her Employment Agreement.  (Id. at ¶ 18; Zabel Decl., Ex. J at ¶ 7.)

On the other hand, in his declaration, Rafkind states that he was responsible for Five Star's contract with Suffolk County and that the Plaintiff's only role in the transaction was to "hand deliver[] the proposal to Suffolk County's procurement offices."  (Rafkind at ¶ 7.)  In

9

addition, the Defendants assert that Suffolk County was an existing client, and therefore, did not fall within the scope of the Employment Agreement.  (Id. at ¶ 8.)

The Plaintiff also did not receive a commission check for her work in procuring a contract with Sahn Ward Coschignano & Baker PLLC ("Sahn Ward").  The parties agree that Sahn Ward was an existing client but do not make clear the circumstances of the transaction or provide a copy of the agreement.  In her declaration, the Plaintiff states that although Sahn Ward was an existing client, "the scope of the original agreement with Sahn Ward was materially expanded to the point that it constituted a new agreement."  (D'Amato at ¶ 21.)  As such, the Plaintiff claims that she is entitled to in excess of $4,000 in commissions.  (Zabel Decl., Ex. J at ¶ 7.)  However, the Plaintiff does not make clear, nor is there any documentary evidence indicating what changes if any, were made to the existing agreement with Sahn Ward.

**H. The Plaintiff's Compensation For Court Reporting Work**

The parties also dispute whether in 2011, the Defendants provided the Plaintiff with at least $20,000 of court reporting work as is required under the Share Purchase Agreement.  In that regard, the Plaintiff's 2011 1099 tax form states that the Plaintiff earned $23,574.99 and an additional $3,326.00 in "nonemployee compensation," which the Defendants claim represents additional income earned by the Plaintiff from court reporting.  (Meyer Decl., Ex. C.)  Further, a document prepared by the Defendant entitled, "Assignment Analysis," states that from August 1, 2010 through October 24, 2012, the Plaintiff was assigned a total of 134 cases as a court reporter and that she cancelled only one of those jobs.  (Meyer Decl., Ex. K.)  In addition, from September 2011 through December 2011, the Plaintiff exchanged a number of emails with Dana Geyer ("Geyer"), the scheduler for Reporter's Ink, in which Geyer offered the Plaintiff court reporting jobs.  (Meyer Decl., Ex. J.)

10

However, the Plaintiff asserts the $23,574.99 listed on her 2011 1099 tax form may also include sales commissions, and therefore, does not necessarily represent additional income that she received from court reporting.  (D'Amato Decl. at ¶ 32.)  She also asserts that she had to give one third of her earnings from court reporting jobs to a "typist," and therefore, even if she was paid more than $20,000 in 2011 for court reporting work, she did not take home $20,000.  (Id. at ¶ 17.)  Finally, she states that some of the court reporting work that she engaged in was not for the benefit of Five Star, but rather, for the benefit of Reporter's Ink, Five Star's parent company. (Id.)

**I. Communications Related to Five Star's Debts**

On September 13, 2010, Melissa Foley ("Foley"), an employee of Reporter's Ink, sent an email to Rafkind, among others, with the subject, "Five Star Outstanding Bills," and purported to attach invoices for Votto & Cassata, Steinberg & Boyle, Lisseth Cutti, U.S. Legal Support, and Wells Fargo.  (Meyer Decl., Ex. E.)  In the email, Foley states, "Attached are outstanding invoices that have been collected from Five Star.  As you can see from the invoices, they are all dated prior to the acquisition.  Please advise how to handle."  (Id.)  Later that day, Foley sent four additional invoices for State Insurance Fund, Safe Guard, Pitney Bowes, and Broadview Networks.  (Id.)  As stated above, the parties did not provide the Court with the invoices referred to in these emails.

As discussed previously, prior to the its acquisition, Five Star stopped making payments pursuant to a lease agreement with De Lage for court reporting equipment.  As a result, on April 25, 2011, De Lage filed a complaint against Five Star and the Plaintiff in the court of common pleas in Chester County, Pennsylvania.  (Meyer Decl., Ex. F.)  De Lage sought $99,811.10 in monetary damages in connection with Five Star's failure to provide De Lage with monthly

11

payments under the lease agreement.  (Id.)  On December 29, 2011, the action was discontinued without prejudice pursuant to an agreement to settle the matter for $57,000.  (Id.)

Further, in a November 3, 2011 email to Rafkind and Christian Visdomini ("Visdomini"), the Plaintiff wrote: "[M]aybe now I can be reimbursed for the over payment to the IRS at closing. When the figure that was supposedly paid at the closing was $10,000 more than the balance due the IRS, we were advised that we will be reimbursed.  It has been over a year and . . . although there is a situation going on with the monies being paid to Lisa [Lugo] and Adrienne [Militello], I am not involved in that and would like to get my reimbursement paid to me now." (Meyer Decl., Ex. G.)  The parties do not state what role Visdomini had in the negotiations of the Share Purchase Agreement, though the email below suggests that he was involved as counsel on behalf of Rafkind and Reporter's Ink.  On the same day, Visdomini responded:

> The day of the closing you provided us with a copy of the business card of one IRS Office; next to the image of the business card, you wrote the word 'paid'. At the closing, I stated that such document could not be accepted, hence, the amount due to the IRS was deducted from your payment, and the ones of your former partners.  I also stated that if the amount owed had indeed been satisfied, we could have issued a separate check to reflect the amount deducted from your check. One or two days after closing, I received a phone call from the IRS: the check that you had issued had bounced and, as a result, the Five Star IRS account was debited with additional penalties and interest . . . . Five Start [sic], at that point, was unable to satisfy the amount due to the IRS and Michael [Rafkind] was forced to lend funds to Reporter's Ink that, in turn, extended a loan to Five Star. The balance to the IRS was satisfied about 1 week thereafter.
>
> I fail to remember the instance of the 'overpayment' or 'excessive deduction' that you describe in your e-mail below; nevertheless, you might be correct.  My colleagues . . . will audit the opening and closing balances at the date of closing and determine if your account was indeed 'over deducted.'

(Id.)

On March 12, 2012, the Plaintiff provided the Defendants with her voluntary notice of termination.  (D'Amato Decl. at ¶ 33.)  The parties do not provide the Court with the notice of

termination.  As such, it is not clear whether the Plaintiff quit her job as a court reporter, her job

as a manager of sales and customer retention for Five Star, or both jobs.

**J. Amendment to the Share Purchase Agreement**

As stated above, pursuant to the Share Purchase Agreement, Reporter's Ink was required

to pay the remaining $300,000 owed to each of the Sellers in installments.  (Meyer Decl., Ex. B,

at 2.)  Prior to September 1, 2011, when the first installment payment was due, Rafkind and

Reporter's Ink sought a "setoff" to deduct the allegedly undisclosed outstanding debts from the

amounts due under the Agreement.  (Zabel Decl., Ex. L.)  Thereafter, the parties commenced

negotiations to execute an amendment to the Share Purchase Agreement reflecting an agreed

upon deduction from the original purchase price.  (Id.)

On April 24, 2012, Rafkind, Reporter's Ink, Militello, and Lugo executed an amendment

to the Share Purchase Agreement. (Zabel Decl., Ex. L.)  Under the terms of this amendment,

Lugo and Militello agreed to reduce the remaining payments owed to each of them under the

Agreement from $300,000 to $255,000.  (Zabel Decl., Ex. L, at 2–3.)

The Plaintiff was not a party to the amendment to the Share Purchase Agreement.

(D'Amato Decl. at ¶ 48.)  On July 10, 2012, she commenced the present action.

## II. DISCUSSION

**A. Legal Standard**

Fed. R. Civ. P. 56(a) provides that a court may grant summary judgment when the

"movant shows there is no genuine issue as to any material fact, and the moving party is entitled

to judgment as a matter of law."  The moving party "always bears the initial responsibility of

informing the district court of the basis for its motion, and identifying those portions of 'the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."
James River Ins. Co. v. Power Mgmt., Inc., No. 12-CV-02706 (ADS), 2014 WL 5460548, at *4
(E.D.N.Y. Oct. 28, 2014) (Spatt, J.) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.
Ct. 2548, 91 L.Ed.2d 265 (1986)).

"If the movant successfully demonstrates that there is no genuine issue of material fact,
then the burden shifts to the non-movant who must come forward with specific facts showing
that a genuine issue exists." U.S. ex rel. Keller Painting Corp. v. Torcon, Inc., No. 12-CV-1061
ADS ARL, 2014 WL 6769234, at *7 (E.D.N.Y. Nov. 29, 2014) (Spatt, J.) (citation omitted).

"A fact is material if it might affect the outcome of the suit under the governing law, and
an issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for
the nonmoving party." Reeves v. Anderson, No. 11-CV-3770 SAS, 2014 WL 7336459, at *3
(S.D.N.Y. Dec. 24, 2014) (citing Windsor v. United States, 699 F.3d 169, 192 (2d Cir. 2012)).
In determining if a genuine dispute of material fact exists, "the court must resolve all ambiguities
and draw all justifiable factual inferences in favor of the party against whom summary judgment
is sought." Buckley v. Deloitte & Touche USA LLP, 888 F. Supp. 2d 404, 415 (S.D.N.Y. 2012)
aff'd, 541 F. App'x 62 (2d Cir. 2013) (citation omitted).  However, a party "opposing summary
judgment does not show the existence of a genuine issue of fact to be tried merely by making
assertions that are conclusory" or "based on speculation." Id. (citations omitted).  In that regard,
"[w]here no rational finder of fact could find in favor of the nonmoving party because the
evidence to support its case is so slight, summary judgment must be granted." Brown v. Eli Lilly
& Co., 654 F.3d 347, 358 (2d Cir. 2011) (internal quotation mark and citation omitted).

14

**B. As to the Plaintiff's Claims**

**1. Choice of Law**

As an initial matter, the Court must determine what law should be applied to the Plaintiff's common law breach of contract and equitable claims for unjust enrichment and quantum meruit, as well as the Defendants' counterclaims for breach of contract.  Where, as here, the court exercises supplemental jurisdiction over the parties' state law claims and counterclaims, the court applies New York choice of law rules. Bass v. World Wrestling Fed'n Entm't, Inc., 129 F. Supp. 2d 491, 503 (E.D.N.Y. 2001) (citations omitted) ("A federal court entertaining state law claims under its supplemental jurisdiction applies the choice of law principles of the state in which it sits."); see also Carroll v. LeBoeuf, Lamb, Greene & MacRae, LLP, 623 F. Supp. 2d 504, 509 (S.D.N.Y. 2009) ("A federal court exercising its supplemental jurisdiction over state law claims such as those asserted here first must determine which state's law will govern.") (citation omitted).

With respect to the contract claims, both the Share Purchase Agreement and the Employment Agreement contain choice of law provisions stating that the agreements shall be governed by New York law.  (Meyer Decl., Ex. A, at 6; Ex. B, at 7.)  "New York courts typically enforce a choice-of-law clause in a contract when the chosen law has a 'reasonable relationship' to the contract and does not violate New York public policy." Chiste v. Hotels.com L.P., 756 F. Supp. 2d 382, 408 (S.D.N.Y. 2010) (citing LaGuardia Assocs. v. Holiday Hospitality Franchising, Inc., 92 F.Supp.2d 119, 127 (E.D.N.Y. 2000)).

Here, New York has a reasonable relationship to the parties' contract claims because the Plaintiff and the Defendant Five Star are citizens of New York and both agreements were performed and negotiated in New York.  (Am. Compl. at ¶¶ 4–6.)  Moreover, neither party

argues that any other state's law should apply to their claims.  Accordingly, the Court will apply

New York law to the parties' contract claims and counterclaims.  See Samba Enterprises, LLC v.

Zango, Inc., No. 06 CIV. 8171 (DC), 2009 WL 736155, at *1 (S.D.N.Y. Mar. 20, 2009) ("The

Agreement contains a choice-of-law provision designating Washington as the governing law,

Washington has a reasonable relationship to the Agreement because [the Defendant] is located in

Washington, and neither party argues that any other state's law should apply.  The Court will

therefore apply Washington contracts law.").

Although the Plaintiff's equitable claims for unjust enrichment and quantum meruit may

fall outside the New York choice of law provisions in the Employment and Share Purchase

Agreements, the parties appear to concede that New York law should apply to those claims and

as described above, New York has the most significant relationship to the instant dispute.

Therefore, the Court will also apply New York law to the Plaintiff's equitable claims.  Xiotech

Corp. v. Express Data Products Corp., No. 6:13-CV-861 (MAD), 2014 WL 1314279 (N.D.N.Y.

Apr. 3, 2014) ("[C]hoice of law does not matter unless the laws of competing jurisdictions are

actually in conflict . . . . As the parties appear to concede, common law unjust enrichment claims

in New York and Minnesota are substantively similar . . . . Thus, because plaintiff's equitable

claims . . . are outside the scope of the Reseller Agreement's choice-of-law provision, New York

law applies.") (citation, internal quotation marks, and alterations omitted).

**2. The Plaintiff's Claim for Breach of the Share Purchase Agreement**

**a. 2011 Court Reporting Work**

Under New York law, to succeed on a breach of contract claim, the Plaintiff must show:

"(1) the existence of an agreement; (2) adequate performance of the contract by the plaintiff; (3)

breach of contract by the defendant; and (4) damages."  Swan Media Grp., Inc. v. Staub, 841 F.

16

Supp. 2d 804, 807 (S.D.N.Y. 2012); see also Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 177 (2d Cir. 2004) (same).

Here, Section III of the Share Purchase Agreement provides that Reporter's Ink "[a]grees that [the] [S]ellers will be guaranteed court reporting work for a minimum of $20,000 per seller per calendar year for three (3) years starting January 1, 2011." (Meyer Decl., Ex. B, at 3.)

The Plaintiff argues that there is no dispute that the Defendants failed to provide the Plaintiff with $20,000 of court reporting work in 2011, and therefore, she is entitled to summary judgment on her claim that the Defendants breached this provision of the Share Purchase Agreement. (The Pl.'s Mem. of Law at 6.) In so arguing, the Plaintiff relies primarily on statements in her declaration that she was only "sporadically . . . asked to work as a court reporter" and that when she was asked to do court reporting work, she "was always required to give one-third (1/3) of [her] earnings to [a] typist." (D'Amato Decl. at ¶ 17.)

In response, the Defendants argue that there is documentary evidence showing that the Plaintiff earned at least $20,000 from court reporting work in 2011. (The Defs.' Mem. of Law at 13.) The Defendants rely on the Plaintiff's 2011 1099 tax form, which states that the Plaintiff earned $23,574.99 and $3,326.00 in "nonemployee compensation." (Meyer Decl., Ex. C.) Yet, as the Plaintiff correctly points out, the IRS form does not indicate how or what the "nonemployee compensation refers to." (Pl.'s Opp'n Mem. of Law at 12.) "Nonemployee employee compensation" could, for instance, include sales commissions that she earned in addition to her $40,000 per year salary. (D'Amato Decl. at ¶ 32.) Without more, the Court cannot conclude, as the Defendant contends, that there is no genuine issue of material fact as whether the Plaintiff earned $20,000 in court reporting work in 2011.

The Court finds that the other documents relied on by the Defendants are also ambiguous. In particular, the Defendants rely on a spreadsheet entitled "Assignment Analysis," which lists 134 cases to which D'Amato had been "assigned" from August 1, 2010 through October 24, 2012. (Meyer Decl., Ex. K., at 1–4.)  However, the spreadsheet does not state what "assigned" means, nor does it state how much money the Plaintiff earned, if any, as a result of being "assigned" to these cases.  The spreadsheet also includes a list of "jobs" that the Plaintiff purportedly worked on in 2011 and the amount she was paid for each of these jobs.  (Id. at 10–12)  Here again, the Defendants do not make clear what these "jobs" are and whether the Plaintiff earned a minimum of $20,000 from them in 2011.

The Defendant further relies on emails exchanged between Geyer, the scheduling coordinator for Reporter's Ink, and the Plaintiff between September 12, 2011 and December 23, 2011 regarding upcoming court reporting jobs.  (Meyer Decl., Ex. I.)  However, none of the emails indicate how much money the Plaintiff received for these jobs, let alone whether it amounted to $20,000.

Therefore, the Court finds that there are material issues of fact precluding summary judgment on the Plaintiff's claim that the Defendants breached the Share Purchase Agreement by failing to properly guarantee her a "minimum of $20,000" in court reporting work in 2011.

### b. 2012 Court Reporting Work

The Plaintiff also claims that the Defendants breached the Share Purchase Agreement by failing to provide the Plaintiff with $20,000 of court reporting work in 2012.  However, there is no dispute that the Plaintiff voluntarily terminated her employment with Five Star on March 12, 2012.  As such, the Defendants cross-move for summary judgment, claiming that they were not

18

obligated to provide the Plaintiff with a minimum of $20,000 in court reporting work in 2012 under the Share Purchase Agreement.  (The Defs.' Opp'n Mem. of Law at 3.)

As stated above, Section III of the Share Purchase Agreement provides that as "additional consideration" for buying the Plaintiff's shares in Five Star, Reporter's Ink "[a]grees that [S]ellers will be guaranteed court reporting work for a minimum amount of $20,000 per seller per calendar year for three (3) years starting January 1, 2011."  (Meyer Decl., Ex. B, at 3.)  The plain language of Section III of the Share Purchase Agreement does not make the obligation of Reporter's Ink to provide the Plaintiff with a minimum of $20,000 in court reporting work contingent upon the Plaintiff maintaining her employment as a manager of sales and customer retention at Five Star.  Indeed, her employment as a manager of sales and customer retention at Five Star appears to be separate and apart from her employment by Reporter's Ink as a court reporter.  In this regard, her employment at Five Star is subject to a separate Employment Agreement for which she receives a salary of $40,000 that does not include her income that she receives as a court reporter under the Share Purchase Agreement.  (Meyer Decl., Ex. A.)

Therefore, the Court finds it is plausible to conclude that the Plaintiff's decision to quit her job as a manager of sales and customer retention at Five Star did not relieve the Defendants of their obligation to provide the Plaintiff with $20,000 of court reporting work under the Share Purchase Agreement.  This is especially the case where, as here, the parties offer no extrinsic evidence to clarify the ambiguity in Section III of the Share Purchase Agreement as to whether the Plaintiff's termination relieves the Defendants of their obligation to the Plaintiff as it relates to court reporting work.  See Topps Co. v. Cadbury Stani S.A.I.C., 526 F.3d 63, 68 (2d Cir. 2008) ("To the extent the moving party's case hinges on ambiguous contract language, summary judgment may be granted only if the ambiguities may be resolved through extrinsic evidence that

is itself capable of only one interpretation, or where there is no extrinsic evidence that would support a resolution of these ambiguities in favor of the nonmoving party's case.").

Accordingly, the Court denies both parties' motions with respect to the Plaintiff's claim that the Defendants breached the Share Purchase Agreement by failing to provide the Plaintiff with at least $20,000 of court reporting work in 2012. See U.S. ex rel. Keller Painting Corp. v. Torcon, Inc., No. 12-CV-1061 (ADS), 2014 WL 6769234, at *12 (E.D.N.Y. Nov. 29, 2014) (Spatt, J) ("Therefore, given that the meaning of 'extra work' is subject to two plausible interpretations, the [c]ourt finds that this portion of the Subcontract is ambiguous at a matter of law, and the jury must resolve whether the Subcontract required Keller to perform work to fix the adhesion issues on Penant 1.").

### 3. The Plaintiff's Breach of the Employment Agreement Claim

As further consideration for acquiring her shares, Five Star and Rafkind entered into a separate Employment Agreement to hire the Plaintiff as "manager of sales and customer retention for Five Star." (Meyer Decl., Ex. A.) Under the Employment Agreement, the Plaintiff's salary "consist[ed] of a base annual salary of $40,000 plus commissions and bonuses as indicated in paragraph IV and V below." (Id.) Section IV of the Agreement, entitled "Commissions and Charges," provides that the Plaintiff "will earn a 10% sales commission on the new sales generated in each calendar year for the years 2011, 2012, 2013, 2014, 2015." The Agreement defines "new sales" as "sales directly generated by Employee within any one calendar year." (Id.)

The Plaintiff asserts that the Defendants breached Section IV of the Employment Agreement by failing to provide her with commission payments for her work in procuring contracts for stenographic services with Suffolk County and Sahn Ward. (The Pl.'s Mem. of

Law at 7–10.)  She appears to concede that both Suffolk County and Sahn Ward had pre-existing contracts with Five Star.  (See The Pl.'s Opp'n Mem. of Law at 11.) However, she argues that procuring these contracts should be considered "new sales" under the Employment Agreement because both Suffolk County and Sahn Ward executed new contracts with Five Star as a result of her efforts.  (Id.)  In response, the Defendants argue that the Plaintiff was not entitled to commission payments because Suffolk County and Sahn Ward were existing clients and therefore, those contracts were not "new sales" under the Employment Agreement.

The Court must first resolve whether Section IV of the Employment Agreement is unambiguous with respect to the question raised by the parties in their present motions — namely, whether procuring the renewal of existing contracts should be considered a "new sale" that entitles the Plaintiff to a commission under the Employment Agreement.  See Nouveau Indus. Inc. v. Liberty Mut. Ins. Co., No. 08 CIV. 10408 (CM), 2011 WL 10901796, at *7 (S.D.N.Y. Sept. 7, 2011) ("'The initial question for the court on a motion for summary judgment' concerning a contract claim 'is whether the contract is unambiguous with respect to the question disputed by the parties.'") (quoting Continental Ins. Co. v. Atlantic Cas. Ins. Co., 603 F.3d 169, 180 (2d Cir. 2010)).

Whether a contract is "ambiguous" is a question of law determined by the court. Diesel Props S.r.l. v. Greystone Bus. Credit II LLC, 631 F.3d 42, 51 (2d Cir. 2011).  "Ambiguous language is that which suggests more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."  Torcon, Inc., 2014 WL 6769234 at *8 (quoting Genon Mid–

21

Atl., LLC v. Stone & Webster, Inc., No. 11 CV 1299 (HB), 2012 WL 1372150, at *5 (S.D.N.Y. Apr.18, 2012)).

Generally, if a court finds the contract language to be ambiguous, the court must deny summary judgment. Topps Co. v. Cadbury Stani S.A.I.C., 526 F.3d 63, 68 (2d Cir. 2008) ("This generally means that a motion for summary judgment may be granted in a contract dispute only when the contractual language on which the moving party's case rests is found to be wholly unambiguous and to convey a definite meaning."). A court can grant summary judgment only "where the ambiguities may be resolved through extrinsic evidence that is itself capable of only one interpretation, or where there is no extrinsic evidence that would support a resolution of these ambiguities in favor of the nonmoving party's case." Id.; see also Keller, 2014 WL 6769234 at *8 ("Although a determination that a contract is ambiguous usually requires the court to deny summary judgment, the court may nonetheless grant summary judgment where 'the extrinsic evidence illuminating the parties' intended meaning of the contract is so one-sided that no reasonable person could decide to the contrary.'") (quoting Nouveau Indus. Inc. v. Liberty Mut. Ins. Co., No. 08 CIV. 10408 (CM), 2011 WL 10901796, at *8 (S.D.N.Y. Sept.7, 2011)).

Here, as stated above, the Employment Agreement defines "new sales" as "sales directly generated by Employee within any one calendar year." (Id.) The Court finds that it is reasonable to conclude, as the Defendant contends, that the parties intended "directly generated" to apply only to contracts with new clients and not to contracts with pre-existing clients, like Sahn Ward and Suffolk County, whose business the Plaintiff did not need to necessarily solicit. (The Defs.' Opp'n Mem. of Law at 4.) On the other hand, the Court finds that a factfinder could also conclude, as the Plaintiff contends, that "directly generated" was intended to apply to any

new contracts — even those with pre-existing clients —  so long as those contracts resulted from the Plaintiff's sales efforts.  (See The Pl.'s Mem. of Law at 7.)

As both parties do not offer any extrinsic evidence to clarify the definition of "new sales," and both parties' interpretation of the term appears to be plausible, the Court finds that the definition of "new sales" in Section IV of the Employment Agreement to be ambiguous as a matter of law.  See Genon Mid-Atl., LLC v. Stone & Webster, Inc., No. 11 CV 1299 (HB), 2012 WL 1372150, at *5 (S.D.N.Y. Apr. 18, 2012) ("Because both interpretations are plausible and both parties offer competent witnesses to support their reading, I conclude that this portion of the EPC Agreement is ambiguous as a matter of law.")

Both parties argue that even if the Court finds that Section IV is ambiguous, they are entitled to summary judgment.  In this regard, the Plaintiff argues the Court should apply the principle, *contra proferentem*, and construe the ambiguity against the Defendants because they drafted the Employment Agreement.

The principle of *contra proferentem* is a doctrine under which courts will construe an ambiguity in agreement against the drafter.  Aircraft Servs. Resales LLC v. Oceanic Capital Co., No. 09 CIV. 8129 PKC, 2013 WL 4400453, at *4 (S.D.N.Y. Aug. 14, 2013) ("New York law provides that ambiguities in a contract must be construed against the drafter."); see also Morgan Stanley Grp. Inc. v. New England Ins. Co., 225 F.3d 270, 276 (2d Cir. 2000) ("[T]he rule of [*contra proferentem*] . . .  generally provides that where an insurer drafts a policy 'any ambiguity in [the] . . . policy should be resolved in favor of the insured.'") (quoting McCostis v. Home Ins. Co., 31 F.3d 110, 113 (2d Cir. 1994)).  However, the Second Circuit has made clear that "'courts should not resort to *contra proferentem* until after consideration of extrinsic evidence to determine the parties' intent.'" Catlin Speciality Ins. Co. v. QA3 Fin. Corp., No. 10 CIV 8844

LGS, 2014 WL 2990520, at *2 (S.D.N.Y. July 2, 2014) (quoting M. Fortunoff Corp. v. Peerless Ins. Co., 432 F.3d 127, 142 (2d Cir. 2005)).

Moreover, *contra proferentem* does not apply in situations where, as here, both parties are represented by counsel and have meaningful opportunities to negotiate contractual terms. See, e.g., Two Locks, Inc., 2014 WL 7335465, at *14; see also Catlin Speciality Ins. Co. v. QA3 Fin. Corp., No. 10 CIV. 8844 (LGS), 2014 WL 2990520, at *4 (S.D.N.Y. July 2, 2014) ("*Contra proferentem* does not apply where contracts are negotiated by sophisticated parties of equal bargaining power."); Aircraft Servs. Resales LLC v. Oceanic Capital Co., No. 09 CIV. 8129 PKC, 2013 WL 4400453, at *4 (S.D.N.Y. Aug. 14, 2013) aff'd, No. 13-3738-CV, 2014 WL 5032409 (2d Cir. Oct. 9, 2014) ("Though [the defendant] did not make changes to the contractual language at issue, the [c]ourt concludes it had meaningful opportunities to negotiate the contractual terms.  Therefore, the general principle that a contract should be construed against its drafter is not controlling."); Westchester Fire Ins. Co. v. MCI Commc'ns Corp., 74 A.D.3d 551, 902 N.Y.S.2d 350, 351 (First Dep't 2010) ("Nor is there a need to resort to *contra proferentum*, which, in any event, would be inapplicable to this sophisticated policyholder."); Coliseum Towers Associates v. Cnty. of Nassau, 2 A.D.3d 562, 565, 769 N.Y.S.2d 293, 296-97 (2d Dep't 2003)  ("However, that rule applies against the party who prepared it, and favorably to a party who had no voice in the selection of its language . . . . The *contra proferentem* doctrine was inapplicable to the subject lease since the record demonstrates that CTA participated in negotiating its terms.") (internal quotation marks and citations omitted).

Here, the Plaintiff was represented by counsel in the negotiations of the Employment Agreement and offers no evidence as to why she did not have a meaningful opportunity to negotiate and make changes to the Agreement.  Indeed, she represents in the Agreement, that

"Dottie D'Amato has had the opportunity consult with and have this Agreement reviewed by counsel of her choosing." (Meyer Decl., Ex. A, at 7.)  Accordingly, the Court declines to apply the principle of *contra preferentem* in the instant case.  See, e.g., Mercury Partners LLC v. Pac. Med. Bldgs., L.P., No. 02 CIV 6005 (HBP), 2007 WL 2197830, at *9 (S.D.N.Y. July 31, 2007) ("In interpreting the provisions of the Agreement, the doctrine of *contra proferentem* has no applicability, because [the plaintiff] and [the defendant] both participated in the drafting of the Agreement over a period of eight months.").

Further, the Defendants contend that the Plaintiff is not entitled to a commission for the Suffolk county contract because her role in the transaction was limited to "hand deliver[ing] the proposal to Suffolk County's procurement offices."  (Rafkind Decl. at ¶ 7.)

However, there is evidence to the contrary.  In her declaration, the Plaintiff states that she "developed and submitted Five Star Reporting's bid proposal [to Suffolk County]" and "attended the bid proposal where Five Star Reporting was ultimately the successful bidder for the Suffolk County [c]ontract."  (D'Amato Decl. at ¶ 20.)  Moreover, Five Star sent the bid proposal to her and she, along with Rafkind, are listed as the primary contacts for the account.  (Zabell Decl., Ex. K.)  Based on this evidence, the Court finds that a factfinder could reasonably conclude that the Plaintiff was entitled to a commission for her work in procuring a renewal contract with Suffolk County.

Therefore, the Court denies both parties' motions with respect to the Plaintiff's claim that the Defendant breached the Employment Agreement by failing to provide her with commissions for the Sahn Ward and Suffolk County contracts.

However, the Court notes that the Plaintiff appears to claim that the Defendant failed to pay her commissions for additional contracts that she helped to procure.  (The Pl.'s Mem. of Law

25

at 8) ("[The] Defendants breached the Employment Agreement by failing to pay [the  Plaintiff]

commissions due and owing for the [Sahn Ward and Suffolk County] sales, <u>as well as many

other sales procured by the Plaintiff.</u>")  However, she provides no information about these

contracts, let alone any evidence from which a jury could reasonably conclude that the

Defendant failed to pay her commissions for them.  <u>D'Iorio v. Winebow, Inc.</u>, No. 12-CV-1205

(ADS), 2014 WL 7335466, at *13 (E.D.N.Y. Dec. 26, 2014) (Spatt, J) ("Nonetheless, the party

opposing summary judgment may not rely on mere conclusory allegations nor speculation, but

instead must offer some hard evidence' in support of its factual assertions.") (quoting <u>Buckley v.

Deloitte & Touche USA LLP</u>, 888 F.Supp.2d 404, 415 (S.D.N.Y. 2012)).  Therefore, the Court

dismisses the Plaintiff's claim to the extent it relies on procuring contracts other than the

contracts with Sahn Ward and Suffolk County.

### 4. The Plaintiff's NYLL § 193 Claim for Commissions

The Plaintiff also claims that the Defendants violated NYLL § 193 by allegedly failing to

pay her "earned commissions."  (The Pl.'s Mem. of Law at 11.)  Under NYLL § 193, employers

are prohibited from making "any deduction from the wages of an employee" for "insurance

premiums, pension or health and welfare benefits, contributions to charitable organizations,

payments for United States bonds, payments for dues or assessments to a labor organization, and

similar payments for the benefit of the employee."  § 193 (1)(a)–(b); <u>see also</u> <u>Pachter v. Bernard

Hodes Grp., Inc.</u>, 10 N.Y.3d 609, 617, 891 N.E.2d 279, 284 (2008).  However, an employer may

make deductions "in accordance with the provisions of any law or any rule or regulation issued

by any governmental agency" or as "expressly authorized in writing by the employee."  N.Y.

Lab. Law § 193 (1)(a)–(b).

However, where, as here, an employee is paid by a commission, NYLL § 193 does not prohibit employers from making deductions if the deductions were made "before the commissions were earned." Gold v. New York Life Ins. Co., No. 09 CIV.3210 (WHP), 2011 WL 2421281, at *6 (S.D.N.Y. May 19, 2011) (quoting Pachter, 891 N.E.2d at 284) (internal quotation marks omitted).  However, if deductions were made "after the employee earns his commission, NYLL § 193 bars them." Id. (citation omitted).

In determining whether an employee's commission is "earned" and thus subject to NYLL § 193, courts will apply the common law rule: a "broker who produces a person ready and willing to enter into a contract upon his employer's terms . . .  has earned his commissions." Chenensky v. New York Life Ins. Co., No. 07 CIV. 11504 (WHP), 2012 WL 234374, at *4 (S.D.N.Y. Jan. 10, 2012) (citing Pachter, 10 N.Y.3d at 617, 861 N.Y.S.2d 246, 891 N.E.2d 279).

The Plaintiff argues that she "earned commissions" by procuring contracts with Suffolk county and Sahn Ward.  (The Pl.'s Mem. of Law at 13–14.)  Thus, she asserts that she is entitled to summary judgment on her NYLL § 193 claim because there is no dispute that the Defendants failed to pay her commissions for those contracts.  (Id.)

However, under New York law, parties "are free to depart" from the common law rule by entering an agreement imposing different conditions on when a commission is earned.  Pachter, 10 N.Y.3d 609, 617, 891 N.E.2d 279, 284 (2008) (citations omitted); see also Gold, 2011 WL 2421281, at *6 ("An employer and employee can agree about the point in time when a commission becomes 'earned' and, therefore, a 'wage.'") (citation omitted); see also Chenensky, 2012 WL 234374, at *4 ("However, '[p]arties are free to depart from the common law by entering into a different arrangement.'") (quoting Pachter, 10 N.Y.3d at 617, 861 N.Y.S.2d 246, 891 N.E.2d 279).

27

Here, Section IV of the Employment Agreement clearly imposes a condition as to when the Plaintiff can earn a commission: specifically, "[The Plaintiff] will earn a 10% sales commission on the new sales generated in each calendar year for the years 2011, 2012, 2013, 2014, and 2015."  (Meyer Decl., Ex. A, at 2.)  Therefore, pursuant to Section IV, the Plaintiff will only earn a commission on "new sales" and the common law rule is not, as the Plaintiff contends, applicable to the instant case.

Moreover, as discussed above, the Court finds that the Employment Agreement is ambiguous as to whether the Sahn Ward and Suffolk County contracts constitute "new sales." Thus, summary judgment is inappropriate because there are genuine issues of material fact about whether the Plaintiff was entitled to commission payments for the Sahn Ward and Suffolk County contracts.  See Chenensky, 2012 WL 234374 at *5 (denying summary judgment on the Plaintiff's NYLL § 193 claim because "the parties offer conflicting evidence as to the nature of any agreement.  Thus, summary judgment is inappropriate because there are genuine disputes of material fact.").  Accordingly, the Court denies the motions of both parties with respect to the Plaintiff's NYLL § 193 claim.

### 5. The Plaintiff's Overtime Claims

The Plaintiff argues that she is entitled to summary judgment on her claim that the Defendants violated the FLSA § 207 and New York State's parallel overtime provision, 12 NYCRR § 142–2.2, by failing to properly pay the Plaintiff for overtime work in excess of forty hours per week.  (The Pl.'s Mem. of Law at 9–11.)  The Defendants cross-move for summary judgment on the same claim, arguing that (i) the Plaintiff was an administrative employee, and, as such, was exempt from FLSA and NYCRR overtime requirements; and (ii) even if she was

28

not an exempt employee, there is no genuine dispute that the Plaintiff worked less than forty hours per week.  (The Defs.' Mem. of Law at 8–11.)

As explained below, material issues of fact preclude summary judgment on the Plaintiff's overtime claims.

### a. The Administrative Exemption

The FLSA and the NYLL require that employers pay time-and-half per hour when employees work more than 40 hours per week.  29 U.S.C. § 207(a) (West); NYCCRR 12 § 142–2.2 ("An employer shall pay an employee for overtime . . . in the manner and methods provided in . . . the Fair Labor Standards Act of 1938.").  However, these requirements are subject to several exemptions, including the administrative exemption, which is at issue in the instant case. See 29 U.S.C.A. § 213 (West); 12 N.Y.C.R.R. § 142–3.2 ("[A]n employer shall pay employees subject to the exemptions of section 13 of the Fair Labor Standards Act.").

Under the administrative exemption, employers are exempt from overtime requirements for "any employee employed in a bona fide . . . administrative . . . capacity."  Id. § 213(a)(1). According to binding Department of Labor regulations, an employee works in an administrative capacity if she is (1) "compensated at no less than $455 a week"' (2) her "primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers," and (3) her "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." Harper v. Gov't Employees Ins. Co., No. 13-4479-CV, 2014 WL 5066492, at *1 (2d Cir. Oct. 10, 2014) (quoting 29 C.F.R. § 541.200(a)).

Courts construe the administrative exemption narrowly, and the burden rests on the employer to prove that a particular employee is exempt from the Act's requirements." Graves v.

Chubb & Son, Inc., No. 3:12-CV-568 (JCH), 2014 WL 1289464, at *4 (D. Conn. Mar. 31, 2014) (citing Havey v. Homebound Mortgage, Inc., 547 F.3d 158, 163 (2d Cir. 2008)); see also Klein v. Torrey Point Grp., LLC, 979 F. Supp. 2d 417, 425 (S.D.N.Y. 2013) ("This exemption, as with all FLSA exemptions, is to be construed narrowly.") (citation omitted).  In addition, the question of how an employee spends his time is factual, while the issue of whether such activities render the employee exempt from the FLSA's overtime provision is a question of law to be decided by the court.  Harper, 754 F. Supp. 2d at 463 (citing Icicle Seafoods. Inc. v. Worthington, 475 U.S. 709, 714, 106 S.Ct. 1527, 89 L.Ed.2d 739 (1986)).

In the instant case, both parties agree that the Plaintiff earned more than $455 a week and thus, satisfies the first factor.  Accordingly, the Court will consider the parties' arguments with respect to the second and third factors.

### i. Primary Duty Element

With respect to the second factor, an employee's work bears on the "general business operations" of her employer if she "'perform[s] work directly related to assisting with the running or servicing of the business, as distinguished, for example,' from working in production or retail sales."  Harper, 2014 WL 5066492 at *1 (quoting 29 C.F.R. § 541.200(a)); see also Davis v. J.P. Morgan Chase & Co., 587 F.3d 529, 531-32 (2d Cir. 2009) ("Employment may thus be classified as belonging in the administrative category, which falls squarely within the administrative exception, or as production/sales work, which does not.").

"The line between administrative and production jobs is not a clear one," especially where, as here, the job relates to the service industry. Davis v. J.P. Morgan Chase & Co., 587 F.3d 529, 532 (2d Cir. 2009); see also Klein v. Torrey Point Grp., LLC, 979 F. Supp. 2d 417, 427 (S.D.N.Y. 2013) ("The border of the administrative exemption is 'not a clear one' outside

the manufacturing context, and must be determined in each case based on 'what [a] particular employee's primary duties actually were.'") (quoting <u>Kadden v. VisuaLex</u>, LLC, 910 F.Supp.2d 523, 540 (S.D.N.Y. 2012)).  The Second Circuit has "drawn an important distinction" "between employees directly producing the good or service," who are not considered exempt, and "employees performing general administrative work applicable to the running of any business," who are considered exempt.  <u>Davis</u>, 587 F.3d at 535 ("Furthermore, we have drawn an important distinction between employees directly producing the good or service that is the primary output of a business and employees performing general administrative work applicable to the running of any business.").  In other words, the "'essence' of an administrative job is that an administrative employee participates in 'the running of a business, and not merely . . . the day-to-day carrying out of its affairs.'" <u>Id.</u> (quoting <u>Bratt v. County of Los Angeles</u>, 912 F.2d 1066, 1070 (9th Cir. 1990)).

For example, in <u>Davis v. J.P. Morgan Chase & Co.</u>, 587 F.3d 529, 535 (2d Cir. 2009), a case that set forth the standards relevant to the second prong of the administrative exemption, the Second Circuit relied in part on <u>Reich v. John Alden Life Ins. Co.</u>, 126 F.3d 1, 10 (1st Cir. 1997).  In that case, First Circuit found that marketing representatives for an insurance company satisfied the second prong of the administrative exemption because it found that the "day-to-day activities of marketing representatives are more in the nature of representing the company and promoting sales of [the defendant's] products" than the "routine selling efforts focused simply on particular sales transactions." <u>Id.</u>  Another factor relevant to the First Circuit's reasoning was that the market representatives' jobs entailed "disseminating information to the marketplace, understanding customers and competitors, and gathering available information to be used in putting together proposals and packages that are appropriate for those customers." <u>Id.</u>; <u>see also</u>

Klein, 979 F. Supp. 2d 417, 428 (S.D.N.Y. 2013) ("If indeed the [p]laintiff's primary duties

included tasks related to vendor relations, customer communications and support, and order

logistics, a jury could find that [the] [p]laintiff's duties were directly related to [the]

[d]efendant's general business operations and distinct from its sales activities."); Amendola v.

Bristol-Myers Squibb Co., 558 F. Supp. 2d 459, 476-77 (S.D.N.Y. 2008) ("Each [pharmaceutical

representative] represents [the defendant] in meetings with medical providers and promotes [the

defendant's] drugs.  The success of [the Defendant's] business depends in part on the success of

its [pharmaceutical representatives] in educating physicians about [the Defendant's drugs]. Thus,

the nature of the work performed by [pharmaceutical representative] is directly related to BMS's

management or business operations.").

         However, in Davis, the Second Circuit also cited favorably Martin v. Cooper Elec.

Supply Co., 940 F.2d 896, 903-04 (3d Cir. 1991).  There, the Third Circuit held that telephone

sales persons for an insurance company were production employees, and thus not subject to the

administrative exemption.  Id.  Even though the salespersons sometimes "negotiate[d],

represent[ed] the company, and purchase[ed] on [the defendant's] behalf . . . ," the court found

that their "primary responsibility" was to "produce sales."  Id. at 904.

         In the present case, there is conflicting evidence in the record as to what the Plaintiff's

job entailed.  The Employment Agreement implies that her responsibilities went beyond the

"routine selling efforts focused simply on particular sales transactions." Davis, 587 F.3d at 536

(quoting Reich v. John Alden Life Ins. Co., 126 F.3d at 10).  In particular, her title, "manager of

sales and customer retention for Five Star," suggests that she had a role in "running or servicing

the business."  (Meyer Decl. Ex. A, at 1).  Other provisions of the Employment Agreement also

suggest that she performed functions more in the nature of management than sales: specifically,

32

Section 1(a) of the Agreement states, "Employee shall devote her entire working time and best efforts to selling [Five Star]'s services and managing the sale and customer retention practices of [Five Star] and shall conduct herself so as to reflect credit upon [Five Star]." (Id.) This job description is analogous to duties that the First Circuit in Reich found to satisfy the second prong of the administrative exception. 126 F.3d at 10 (finding second prong to be satisfied because the duties of the marketing representative included, "disseminating information to the marketplace, understanding customers and competitors, and gathering available information to be used in putting together proposals and packages that are appropriate for those customers.").

However, the Defendants do not make clear what the Plaintiff's managerial duties were or even what her position was in Five Star's organization. The Defendant Rafkind's own declaration describes the Plaintiff's duties as ministerial. For example, he states that "[the] Plaintiff played no active or substantive role in developing and/or procuring either the renewal of the Suffolk County Contract or the Sahn Ward Contract. This process was limited to Five Star's upper management, specifically myself." (Rafkind Decl. at ¶ 9.) He further states that her only role in procuring the Suffolk County contract was to "simply hand deliver[] the proposal to Suffolk County's procurement offices." (Id. at ¶ 7.)

Moreover, in her declaration, the Plaintiff represents that her "job duties were entirely sales based" and that she "did not supervise any other employees." (D'Amato Decl. at ¶ 4.) Based on these conflicting statements, the Court finds that it would be reasonable for a factfinder to conclude that the Plaintiff's primary duty was not "performance of office or non-manual work," but rather, routine sales work. See Klein, 979 F. Supp. 2d at 428 ("If, in contrast, the [p]laintiff simply provided dedicated sales support to a single outside salesperson and did not devote any significant portion of his time to non-sales activities, a jury could find that he was

involved in 'producing' the sales that are the core of [the] [d]efendant's business and not in 'servicing' that business in an administrative capacity.").

Therefore, at this stage of the litigation, the Court concludes that each party has presented sufficient evidence to preclude summary judgment for the opposing party on the second factor of the administrative exception test. See Graves, 2014 WL 1289464 at *7 ("While [the [d]efendant will bear, at trial, the burden of proving all elements of the administrative exemption . . . each party has presented evidence sufficient, at this stage, to preclude summary judgment for the opposing party on the primary duty element.")

### ii. Discretion Element

As stated above, the third factor of the administrative exemption test requires that the employee's primary duty include the "exercise of discretion and independent judgment with respect to matters of significance."  29 C.F.R. § 541.200(a).  "The exercise of discretion and independent judgment 'implies that the employee has authority to make an independent choice, free from immediate direction or supervision.'" Coleman–Edwards v. Simpson, 330 F. App'x 218, 220 (2d Cir. 2009) (quoting 29 C.F.R. § 541.202(c)).  Notably, "the fact that a plaintiff's decisions or recommendations frequently required supervisor approval do not render her actions nondiscretionary." Klein, 979 F. Supp. 2d at 429 (quoting Savage v. UNITE HERE, No. 05 Civ. 10812 (LTS), 2008 WL 1790402, at *10 (S.D.N.Y. Apr. 17, 2008)) (internal quotation marks and alterations omitted).  Among the key factors illustrating that an employee possesses the requisite independence to satisfy the administrative exemption is whether 'an employee[] [has] discretion to set her own schedule and to tailor communications to a client's individual needs.'" Id. at 429 (citation omitted).

34

Here, the record regarding the Plaintiff's position in Five Star is not sufficiently developed.  The parties do not provide evidence as to how many employees worked for Five Star, whether the Plaintiff directly supervised any sales employees, and whether any employees supervised the Plaintiff.  While these facts would not necessarily be determinative, they would be highly relevant to the Court's inquiry. 29 C.F.R. § 541.200(a)(3) (noting that one of the relevant factors in determining whether an employee has "discretion and independent judgment with respect to matters of significance" is "whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices."); see also Graves, 2014 WL 1289464 at *8 ( "The exercise of discretion and independent judgment implies that the employee has authority to make an independent choice, free from immediate direction or supervision, though decisions or recommendations that are reviewed at a higher level, may still be considered sufficiently discretionary to satisfy the duties test.") (internal quotation marks and citations omitted).

Moreover, the parties present conflicting contentions on this issue.  For example, in his declaration, Rafkind states, "[The] Plaintiff had discretion to provide bid proposals and quotes to potential clients."  (Rafkind Decl. at ¶ 3.)  Yet, as described above, this statement is in tension with Rafkind's own description of the Plaintiff's role in procuring the Sahn Ward and Suffolk county contracts as being limited to ministerial duties.  (Id. at ¶ 9.)

Similarly, in her declaration, the Plaintiff states that she "did not supervise any other employee" and that "before making any sales" she "would call Michael Rafkind to discuss the terms of the contract."  (D'Amato Decl. at ¶¶ 4, 16.)  Yet she also states that she "personally effectuated an Ordering Contract with Sahn Ward" and Suffolk County.  (Id. at ¶¶ 19, 21.)  Here

35

again, her own statements present potentially conflicting accounts of her authority and role in Five Star's business.

The parties also dispute whether the Plaintiff had authority to set her own schedule.  See Klein, 979 F. Supp. 2d at 429 ("Among the key factors illustrating that an employee does possess the requisite independence to satisfy the administrative exemption include an employee's discretion to set her own schedule and to tailor communications to a client's individual needs.") (internal quotation marks and citations omitted).  On the one hand, the Plaintiff states that she was required to report to Five Star from 9 a.m. to 6 p.m. (D'Amato Decl. at ¶ 8.)  On the other hand, the Defendants assert that the Plaintiff "was not required to work specific hours" and that she often worked "remotely and very rarely was present at our John St. office."  (Rafkind Decl. at ¶ 4.).

Based on this conflicting testimony, a reasonable fact finder could credit and weigh this evidence and draw appropriate inferences to find for either party.  It is not the Court's role to make such determinations at this stage of the litigation.  Graves, 2014 WL 1289464 at *7 ("The present record largely consists of such affidavits and deposition testimony, whose weight and credibility it is not for the court to determine at the summary judgment stage."); see also Kaytor v. Elec. Boat Corp., 609 F.3d 537, 545 (2d Cir. 2010) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.") (internal quotation marks, citations, and alterations omitted).  Therefore, the existence of disputed material facts precludes summary judgment on this third element, as on the second element of the administrative exemption.

### b. The Plaintiff's Hours

The Defendants also argue that they are entitled to summary judgment on the Plaintiff's overtime claims because it is undisputed that the Plaintiff worked less than forty hours per week. The Court disagrees.

As stated above, both parties rely solely on conflicting declarations as to the Plaintiff's work hours.  Under such circumstances, summary judgment is inappropriate. See Graves, 2014 WL 1289464 at *7 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether [s]he is ruling on a motion for summary judgment or for a directed verdict.") (quoting parenthetically Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).

### 6. The Plaintiff's Retaliation Claim

In her complaint, the Plaintiff asserts that the Defendants violated retaliation provisions of the FLSA, 29 U.S.C. § 203, and its New York equivalent, NYLL § 215, by filing counterclaims against the Plaintiff for breach of the Share Purchase Agreement.  The Plaintiff argues that she is entitled to summary judgment on this claim because the Defendants' counterclaims lack reasonable basis in law and were made with discriminatory animus.  (The Pl.'s Mem. of Law at 14–17.)  In response, the Defendants argue that their counterclaims are meritorious, and, therefore the Court should dismiss the Plaintiff's retaliatory claims.  (The Defs.' Mem. of Law at 7–8.)

Under the FLSA § 215(a)(3) and NYLL § 215(1)(a), it is unlawful to discriminate against an employee because that employee "has filed any complaint or instituted or caused to be instituted any proceeding under [FLSA]." 29 U.S.C. § 215(a)(3).  To make a *prima facie* retaliation claim, the Plaintiff must show: "(1) participation in protected activity known to the

defendant, like the filing of a FLSA lawsuit; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action." Flores v. Mamma Lombardis of Holbrook, Inc., 942 F. Supp. 2d 274, 278 (E.D.N.Y. 2013) (quoting Mullins v. City of New York, 626 F.3d 47, 53 (2d Cir. 2010)); see also Belizaire v. RAV Investigative & Sec. Servs. Ltd., No. 12-CV-8268 JPO, 2014 WL 6611560, at *14 (S.D.N.Y. Nov. 21, 2014) ("In order to establish a prima facie case of retaliation under the FLSA, a plaintiff must show '(1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action.'") (quoting Torres v. Gristede's Operating Corp., 628 F.Supp.2d 447, 472 (S.D.N.Y. 2008)).

There is no dispute that the Plaintiff's filing of this lawsuit constitutes "protected activity." See Fei v. WestLB AG, No. 07CV8785(HB)(FM), 2008 WL 594768, at *3 (S.D.N.Y. Mar. 5, 2008) ("Lawsuits in response to a former employee's attempt to vindicate his rights can constitute retaliation.") However, the Plaintiff has failed to allege any facts suggesting an "adverse employment action" as a result of the Defendants filing the counterclaims. An adverse employment action must "affect[ ] 'the terms, privileges, duration, or conditions of the plaintiff's employment.'" Ginsberg v. Valhalla Anesthesia Associates, P.C., 971 F. Supp. 144, 148 (S.D.N.Y. 1997) (citing Yankelevitz v. Cornell University, No. 95 Civ. 4593 (PKL), 1996 WL 447749 at *5 (S.D.N.Y. Aug.7, 1996)). In particular, a plaintiff must show that the counterclaims had some impact on the plaintiff's employment or prospective employment. Id. ("[T]here must be some impact on [the] plaintiff's employment or prospective employment for the counterclaims to constitute an 'employment action.'"); see also Fei, 2008 WL 594768 at *3 ("But for a counterclaim to be actionable as retaliatory, it must have some impact on the

plaintiff's employment or prospective employment.") (citing <u>Kreinik v. Showbran Photo, Inc.</u>, No. 02CIV.1172(RMB)(DF), 2003 WL 22339268 (S.D.N.Y. Oct. 14, 2003)).

For example, in <u>Ginsberg v. Valhalla Anesthesia Associates, P.C.</u>, 971 F. Supp. 144, 148 (S.D.N.Y. 1997), the court dismissed a plaintiff's retaliation claims because the "defendant's counterclaims relate to a simple breach of contract that does not reflect negatively on plaintiff's ethical or professional reputation." <u>Id.</u> The court distinguished its case from <u>Yankelevitz v. Cornell University</u>, No. 95 Civ. 4593(PKL), 1996 WL 447749 at *5 (S.D.N.Y. Aug.7, 1996). In <u>Yankelevitz</u>, the court denied the defendants' motion to strike the plaintiffs' retaliation claim because the counterclaims filed by the defendants alleged that the plaintiff improperly performed an audit, which "shed a negative light on plaintiff's professionalism and ethics in a profession that holds such qualities in high regard." <u>Id.</u>

Here, as in <u>Ginsberg v. Valhalla Anesthesia Associates, P.C.</u>, the Defendants' counterclaims related to "a simple breach of contract." 971 F. Supp. at 148. The Plaintiff does not allege any facts that could plausibly suggest that her reputation or job prospects have been affected by the Defendants' counterclaims.

Accordingly, the Court denies the Plaintiff's motion with respect to her retaliation claims under the FLSA and NYLL, grants the Defendants' cross-motion with respect to those claims, and dismisses the Plaintiff's retaliation claims.

### 7. The Plaintiff's Unjust Enrichment and Quantum Meruit Claims

Finally, the Plaintiff asserts "in the alternative" claims for unjust enrichment and quantum meruit. In particular, she alleges that the Plaintiff performed "numerous and valuable services" for the Defendants for which she did not receive compensation. (Amended Compl. at ¶¶ 64–67.) The Defendants argue that they are entitled to summary judgment on the Plaintiff's

equitable claims as those claims arise out of the Employment and Share Purchase Agreements and are, thus, not independently sustained causes of action.  (The Defs.' Mem. of Law at 14.)

In response, the Plaintiff appears to concede that her equitable claims arise out of the contract but asserts, without citing to any legal authority, that her claims are valid "until a determination is made by the Court concerning the validity of the contracts at issue."  The Court disagrees.

 Under New York law, a claim for quantum meruit and unjust enrichment are quasi-contract claims.  Goll v. First Tennessee Capital Markets, No. 05 CIV. 7890 (HB), 2006 WL 2135801, at *3 (S.D.N.Y. Aug. 1, 2006) ("Under New York law, these two claims [unjust enrichment and quantum meruit] are analyzed together as a quasi-contract claim.") (citing Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168, 175 (2d Cir. 2005)).  As such, these claims generally exist only where there is no express agreement between the parties.  Klein, 979 F. Supp. 2d 417, 434 (S.D.N.Y. 2013); see also Valley Juice Ltd., Inc. v. Evian Waters of France, Inc., 87 F.3d 604, 610 (2d Cir. 1996) ("Under New York law, '[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter.'") (citation omitted).

Here, the parties concede that the Employment Agreement and the Share Purchase Agreement govern the Plaintiff's compensation and, thus, that the Plaintiff's claims for payment of commissions and court reporting work arise from those agreements.  Under such circumstances, the Plaintiff's claims for quantum meruit and unjust enrichment must fail as a matter of law.  See, e.g., Klein, 979 F. Supp. 2d 417 ("Since the parties contracted in the Offer Letter regarding the basis for commission payments, [the] [p]laintiff's quantum meruit claim

40

cannot survive . . . . Defendant's motion for summary judgment on Plaintiff's quantum meruit claim is granted.").

Accordingly, the Court denies the Plaintiff's motion with respect to her claim for unjust enrichment and quantum meruit, grants the Defendants' motion with respect to that claim, and dismisses the Plaintiff's claim for unjust enrichment and quantum meruit.

## C. As to the Defendants' Counterclaims

The Defendants also assert counterclaims for breach of contract and unjust enrichment, alleging that the Plaintiff failed to disclose a pre-closing lawsuit judgment, unpaid taxes, and outstanding invoices.  (Am. Compl. at ¶¶ 94–115.)  The Defendants argue that they are entitled to summary judgment on their counterclaims because there is no dispute that the Plaintiff incurred debts prior to the closing which she did not disclose to the Defendants.  (The Defs.' Mem. of Law at 5–7.)  In response, the Plaintiff asserts that there is a material issue of fact as to whether the Defendants were aware of Five Star's debts prior to entering into the Share Purchase Agreement, and as such, the Court should deny summary judgment.

### 1. Breach of Contract Claim

To prevail on a claim for breach of express representation and warranties, a plaintiff must show: "(1) that it entered into a contract with the defendant, (2) the contract contained an express warranty by the defendant with respect to a material fact, (3) the warranty was part of the basis of the bargain, and (4) the defendant breached the express warranty."  La Salle Bank Nat. Ass'n v. CIBC Inc., No. 08 CIV. 8426 (WHP), 2011 WL 4943341, at *3 (S.D.N.Y. Oct. 17, 2011) (citing LaSalle Bank Nat'l. Ass'n. v. Merrill Lynch Mortg. Lending, Inc., No. 04 Civ. 5452(PKL), 2007 WL 2324052, *8 (S.D.N.Y. Aug.13, 2007)); see also Morgan Guar. Trust Co. of New York v. Bay View Franchise Mortgage Acceptance Co., No. 00 CIV. 8613 (SAS), 2002

41

WL 818082, at *4 (S.D.N.Y. Apr. 30, 2002) ("[U]nder New York common law, a buyer may

hold a seller accountable for breach of an express warranty upon showing that (1) the defendant

breached the express warranty, and (2) the parties 'relied' on the express warranty as part of the

bargain between the parties."); CBS Inc. v. Ziff-Davis Pub. Co., 75 N.Y.2d 496, 503-04, 553

N.E.2d 997, 1001 (1990) ("The express warranty is as much a part of the contract as any other

term.  Once the express warranty is shown to have been relied on as part of the contract, the right

to be indemnified in damages for its breach does not depend on proof that the buyer thereafter

believed that the assurances of fact made in the warranty would be fulfilled.  The right to

indemnification depends only on establishing that the warranty was breached.").

    The Defendants claim that the Plaintiff breached express warranties and representations

in the Share Purchase Agreement by failing to disclose prior to entering the Share Purchase

Agreement Five Star's (a) outstanding debts with certain vendors and (b) outstanding tax liens.

The Court will address each argument in turn.

### a. Outstanding Vendor Obligations

    With respect, to Five Star's outstanding debts to vendors, the Defendants argue that the

Plaintiff breached the following representations in the Share Purchase Agreement:  (i) "[the]

Sellers have disclosed all assets and liabilities of Five Star to buyer"; (ii) "[the] Sellers are aware

of no actions against [the] [S]ellers(s) and no facts which could or may give rise to an action

against [the] [S]ellers(s)"; and (iii) "[the] [S]ellers are aware of no actions against the corporation

and no facts which could or may give rise to an action against the corporation or Five Star other

than the New York State Department of Labor investigation involving Rebecca Wood."  (Meyer

Decl., Ex. B, at 4.)   The Defendants also argue that the Plaintiff breached an express warranty in

the Share Purchase Agreement made by the Sellers that "Five Star will be free of any debt at the

date of the sale (including shareholders loans, and/or other shareholder financing), as related to Five Star, not personally by each shareholder."  (Meyer Decl., Ex. B, at 5.)

The Defendants contend that there is no dispute that the Plaintiff failed to disclose Five Star's debts to State Insurance Fund, Safe Guard, Pitney Bowes, Broadview Networks, Village Office Supply, Votto & Cassata, Steinberg & Boyle, Lisseth Cutti, U.S. Legal Support and Wells Fargo.  (The Defs.' Mem. of Law at 5–6.)  In so arguing the Defendants rely on a September 13, 2010 email from Foley, an employee of Reporter's Ink, to Rafkind attaching these invoices and stating, "Attached are outstanding invoices that have been collected from Five Star.  As you can see from the invoices, they are all dated prior to the acquisition.  Please advise how to handle." (Meyer Decl., Ex. E.)

However, according to the record before the Court, it was Rafkind, not Foley, who was primarily involved in the negotiations of the Share Purchase Agreement.  (Rafkind Decl. at ¶ 23.) Therefore, this email does not establish what, if anything, Rafkind was told by the Sellers about Five Star's outstanding invoices prior to signing the Share Purchase Agreement.  Moreover, the Plaintiff asserts in her declaration that Rafkind "assured" her prior to the signing of the Share Purchase Agreement that "he would take responsibility for any and all remaining liabilities attributable to Five Star and to [her], as a former shareholder."  (D'Amato Decl. at ¶ 50.)  As such, and in light of the spare record before it, the Court finds that a reasonable juror could find that Rafkind was aware of Five Star's outstanding obligations, including these invoices, prior to the closing, and therefore, did not rely on the representations and warranties in the Share Purchase Agreement.  See  LaSalle Bank Nat. Ass'n, 2007 WL 2324052 at *15 ("[T]he question of the materiality of a party's contractual beach is a question better suited for resolution by a jury than this Court.").

The Defendants further contend that they discovered after signing the Share Purchase Agreement that the Plaintiff had defaulted on a lease agreement with De Lage for court reporting equipment.  (Id.)  Specifically, the Defendants allege that they became aware of the default on April 25, 2011 when De Lage filed a complaint in the court of common pleas in Chester County, Pennsylvania seeking $99,811.10 in monetary damages.  (Meyer Decl., Ex. F.)  In support of this proposition, the Defendants rely primarily on Rafkind's statement in his declaration that the "Plaintiff failed to disclose certain tax liabilities, debts liabilities, and judgments against Five Star that arose prior to the closing date."  (Rafkind Decl. at ¶ 23.)  However, as described above, Rafkind's declaration is controverted by the Plaintiff's declaration, in which she states that she informed the Plaintiff of Five Star's obligations prior to entering the Share Purchase Agreement.  (D'Amato Decl. at ¶ 50.)

As the present record largely consists of conflicting evidence and witness declarations, whose weight and credibility it is not for the court to determine at the summary judgment stage, the Court finds that summary judgment is not appropriate with respect to the Defendants' claims relating to Five Star's debts to its vendors.  See Graves, 2014 WL 1289464 at *7 ("The present record largely consists of such affidavits and deposition testimony, whose weight and credibility it is not for the court to determine at the summary judgment stage.").

### b. Outstanding Tax Lien

The Plaintiff also made the following representations and warranties regarding Five Star's taxes: (ii) "Five Star's payment of the taxes owed by it is current and not in arrears"; and (ii) "[a]ny existing UCC filings will be removed and federal, state and local taxes will be filed and paid to date other than the disclosed IRS Payroll Tax Lien."  (Meyer Decl., Ex. B, at 4–5.)  Further the Sellers, including the Plaintiff, agreed to indemnify "[Reporter's Ink] for . . . any and

44

all liabilities, including, without limitation, interest, additions to tax, fines, assessments and penalties, and reasonable attorney's fees incurred . . . with respect to" "(a) [t]axes for any taxable year ending prior to the closing date" and "(b) [t]axes of Five Star for the portion of the taxable year ending on the closing date for the taxable year of Five Star that includes the closing date." (Id. at 8.)

The Defendants argue that the Plaintiff breached these representations and warranties because several days after the closing, Rafkind was forced to pay the IRS $28,268.66 in unpaid taxes for 2009.  (The Defs.' Mem. of Law at 7.)  In response, the Plaintiff contends that Reporter's Ink was aware of Five Star's tax liabilities prior to signing the Share Purchase Agreement and at the closing deducted $28,268.66 from the purchase price to account for it. (D'Amato Decl. at ¶ 44.)

Again, the Court finds the record to be ambiguous on this issue.  In a November 3, 2011 email to Rafkind and Visdomini, D'Amato wrote, "[M]aybe now I can be reimbursed for the over payment to the IRS at closing. When the figure that was supposedly paid at the closing was $10,000 more than the balance due the IRS, we were advised that we will be reimbursed.  It has been over a year and . . . although there is a situation going on with the monies being paid to Lisa [Lugo] and Adrienne [Militello], I am not involved in that and would like to get my reimbursement paid to me now."  (Meyer Decl., Ex. G.)  This email tends to support the Plaintiff's account that the Defendant deducted money from the $200,000 due to her at closing to account for the tax liability.

However, on the same day, Visdomini responded:

The day of the closing you provided us with a copy of the business card of one IRS Office; next to the image of the business card, you wrote the word 'paid'. At the closing, I stated that such document could not be accepted, hence, the amount due to the IRS was deducted from your payment, and the ones of your former

45

> partners.  I also stated that if the amount owed had indeed been satisfied, we could have issued a separate check to reflect the amount deducted from your check. One or two days after closing, I received a phone call from the IRS: the check that you had issued had bounced and, as a result, the Five Star IRS account was debited with additional penalties and interest . . . . Five Start [sic], at that point, was unable to satisfy the amount due to the IRS and Michael [Rafkind] was forced to lend funds to Reporter's Ink that, in turn, extended a loan to Five Star. The balance to the IRS was satisfied about 1 week thereafter.

 (Id.) Visdomini's response appears to suggest that some amount, though it is not clear how much, was deducted from the amount owed to the Plaintiff under the Share Purchase Agreement but that the amount was not sufficient to cover Five Star's tax liabilities because the IRS levied additional penalties on Five Star after the closing.

The other evidence before the Court does not clarify this dispute of fact.  In particular, the Plaintiff relies on a document entitled, "Due Diligence" which lists the documents that were provided to Reporter's Ink as part of the due diligence process prior to the closing on August 31, 2010.  (Id. at 1.)  In particular, page 13 of the report, entitled "Financial Information," notes in response to a request for "tax returns" "for the last five years," that "[t]ax returns [were] supplied."  (Id. at 13.)  However, the parties do not provide the Court with the documents that the Defendants purportedly reviewed, and thus, it not possible to establish what, if anything, those documents disclosed relating to Five Star's tax liabilities.  Moreover, as stated above, Rafkind and the Plaintiff offer conflicting statements in their declarations as to whether Five Star's debts, including tax liabilities, were properly disclosed to the Defendants prior to signing the Share Purchase Agreement.

Based on this conflicting evidence, the Court finds summary judgment to be inappropriate at this stage of the litigation.  See Graves, 2014 WL 1289464 at *8 ("A reasonable jury could credit and weigh this evidence and draw appropriate inferences to find for either party. It is not the court's job to do so at the summary judgment stage.").

However, the Court notes that the Defendants also assert a counterclaim, in the alternative, for unjust enrichment and quantum meruit for the Plaintiff's failure to disclose Five Star's pre-acquisition liabilities.  As with the Plaintiff's claims for unjust enrichment and quantum meruit, the Defendants' counterclaims appear to rely solely on the Plaintiff's representations in the Share Purchase Agreement.  As such, they are duplicative of the Defendants' counterclaim for breach of contract and fail as a matter of law.  See Valley Juice Ltd., Inc. v. Evian Waters of France, Inc., 87 F.3d 604, 610 (2d Cir. 1996) ("Under New York law, the existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter.") (internal quotation marks, citations, and alterations omitted); Klein, 979 F. Supp. 2d 417 ("Since the parties contracted in the Offer Letter regarding the basis for commission payments, [the] [p]laintiff's quantum meruit claim cannot survive . . . . Defendant's motion for summary judgment on Plaintiff's quantum meruit claim is granted.").  Therefore, the Court denies the Defendants' cross-motion with respect to their counterclaim for unjust enrichment and quantum meruit, grants the Plaintiff's motion with respect to that counterclaim, and dismisses the Defendants' counterclaim for unjust enrichment and quantum meruit.

### III.  CONCLUSION

For the foregoing reasons, it is hereby:

**ORDERED**, that the parties' motions with respect to the Plaintiff's claim for breach of the Share Purchase Agreement are denied; and it is further

**ORDERED**, that the parties' motions with respect to the Plaintiff's claim that the Defendants breached the Employment Agreement by failing to pay her sales commissions is denied; however, the Court notes that the Plaintiff's claim at trial will be focused solely on the

question of whether she is entitled to commissions for procuring the Sahn Ward and Suffolk County contracts; and it is further

**ORDERED**, that both parties' motions with respect to the Plaintiff's claim for commissions under NYLL § 193 are denied; and as with the claim above, the Plaintiff's NYLL § 193 claim will be limited to the question of whether she is entitled to commissions for procuring the Sahn Ward and Suffolk County contracts; and it is further

**ORDERED**, that both parties' motions with respect to the Plaintiff's claims under the FLSA and NYLL for overtime are denied; and it is further

**ORDERED**, that the Plaintiff's motion with respect to her retaliation claims under the FLSA and NYLL is denied; the Defendants' cross-motion with respect to those claims is granted; and, the Plaintiff's NYLL and FLSA retaliation claims are dismissed; and it is further

**ORDERED**, that the Plaintiff's motion is denied with respect to her claim for unjust enrichment and quantum meruit; the Defendants' cross-motion is granted with respect to that claim; and the Plaintiff's claim for unjust enrichment and quantum meruit is dismissed; and it is further

**ORDERED**, that the parties' motions with respect to the Defendants' counterclaim for breach of contract are denied; and it is further

**ORDERED**, that the Defendants' cross-motion with respect to their claim for unjust enrichment and quantum meruit is denied; the Plaintiff's motion with respect to that counterclaim is granted; and the Defendants' counterclaim for unjust enrichment and quantum meruit is dismissed.

48

**SO ORDERED.**
Dated: Central Islip, New York
January 17, 2015

_/s/ Arthur D. Spatt_____
ARTHUR D. SPATT
United States District Judge